FILED

10/26/2018

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 1, 2018

IN RE JONATHAN M.

Appeal from the Juvenile Court for Knox County
No. 117916   Timothy E. Irwin, Judge

_____

No. E2018-00484-COA-R3-PT

_____

Father appeals the termination of his parental rights to one child.  The juvenile court found three statutory grounds for termination: (1) abandonment for failure to visit by an incarcerated parent; (2) abandonment by wanton disregard for the welfare of a child by an incarcerated parent; and (3) failure to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility for the child.  The court also found that termination of the father's parental rights was in the child's best interest.  We affirm the termination of the father's parental rights.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which THOMAS R. FRIERSON II and ARNOLD B. GOLDIN, JJ., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, John Thomas M.

Herbert H. Slatery III, Attorney General and Reporter, and Brian A. Pierce, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

OPINION

I.

Jonathan M. was born in April 2010 to Jennifer P., a single mother.  His biological father, John Thomas M., was present at his birth and was included on the birth certificate as Jonathan's legal father.  *See* Tenn. Code Ann. §§ 24-7-113 (2017), 68-3-302 (2013), 68-3-305(b) (2013).  But on July 6, 2010, the maternal grandmother filed a dependency and neglect petition in the Juvenile Court for Knox County, Tennessee, seeking

temporary custody because Mother was unable to care for him. Father was not involved. With Mother's consent, the juvenile court granted temporary legal and physical custody of Jonathan to the maternal grandmother.

During Jonathan's first three years, Father visited with his son regularly, but did not pay formal child support. Each time Mother brought Jonathan to visit, Father gave her money. He also bought gifts for Jonathan, such as a pet fish. According to Father, they had a close father-son relationship.

But Father routinely engaged in criminal activity. He sold "weed and cocaine" and was convicted of drug possession and resisting arrest in September 2010.

In April 2013, Father was arrested for criminal simulation after being found in a hotel room with his wife, Jonathan, and several other women. The other women were arrested for prostitution. Father's arrest brought an abrupt end to the visit with his son. And, as it turned out, this was Father's last visit.

In July 2013, the juvenile court returned Jonathan to Mother's custody after finding she had demonstrated her fitness to care for him. Father was not present for the hearing.

The following October, Father and his wife moved to Arkansas to be closer to his extended family. Although Father told Mother he was still interested in spending time with Jonathan after the move, he never followed up on their conversation. And his pattern of criminal activity continued. In May 2014, he was arrested for felony drug possession and possession of a firearm and served four months in jail. He was released only to return to jail again for firing a gun during a dispute with a house guest. And in September 2014, he pled guilty to three counts of drug possession. He received a four-year sentence but was released on probation. Father remained out of jail for at least a year. But his repeated incarcerations cost him his house and his job. He began selling methamphetamine to supplement his income. Father knew that selling drugs "was wrong. It was just I needed extra money to pay bills."

On February 4, 2015, the paternal grandparents of Jonathan's half-sibling filed a petition in the juvenile court alleging Jonathan and his half-sibling were dependent and neglected. The children had already been removed from Mother's home based on reports of physical abuse, and the paternal grandparents requested custody. The Tennessee Department of Children's Services ("DCS") moved to intervene. After a preliminary hearing, the court granted the paternal grandparents temporary custody and ordered supervised visitation for Jonathan's parents. Father was not notified about the new proceeding because DCS was unable to locate him.

2

Although he did not receive official notice, based on a conversation with Mother, Father was aware that Jonathan had been admitted to the hospital. And the paternal grandparents contacted him with the news that they had been granted custody of Jonathan. Through the paternal grandparents, he also learned that Jonathan had been physically abused. But Father did not seek custody because he assumed that "everything was resolved."

Over the phone, Father told Jonathan about his new home in Arkansas and explained that he could visit and have his own room. But Father did not pursue visitation because he "was working a lot at the time." And even though he was employed, he sent no money for Jonathan's care.

In June 2015, the maternal grandmother requested custody of Jonathan. With the consent of the paternal grandparents of his half-sibling, the juvenile court granted maternal grandmother temporary custody. On July 20, 2015, the juvenile court adjudicated Jonathan dependent and neglected based on severe abuse perpetuated by Mother and her boyfriend. Because Father was not present, the court order specified that he could file a petition to establish visitation.

On November 2, 2015, in the Juvenile Court for Knox County, Tennessee, DCS filed a petition for temporary legal custody of Jonathan after receiving a report that he had been physically abused. The court entered a protective custody order placing Jonathan in foster care that same day. Again, DCS did not notify Father because his whereabouts were unknown. On June 14, 2016, the court adjudicated Jonathan dependent and neglected based on clear and convincing evidence that the maternal grandmother was unable to provide appropriate care and supervision.[1]

In 2016, Father was arrested for failure to report, a violation of his probation. After his probation was revoked, he went to prison to serve the remainder of his sentence.

On August 22, 2017, while he was still incarcerated, DCS filed and served Father with a petition to terminate his parental rights. DCS alleged three grounds for termination: (1) abandonment for failure to visit by an incarcerated parent; (2) abandonment by wanton disregard for the welfare of a child by an incarcerated parent; and (3) failure to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility for the child.

The court held a hearing on February 15, 2018. Father participated by telephone and was represented by appointed counsel. Father explained that he loved his son and hoped for a chance to prove that he could be a good parent. While in prison, he had

---

[1] The court concluded that DCS had not proven by clear and convincing evidence that maternal grandmother had physically abused Jonathan.

completed classes on substance abuse and anger management. And he had recently been granted parole. One condition of his parole was a sixty-day stay in a halfway house. At the time of trial, Father was still incarcerated because no space was available at the halfway house. He estimated needing three to six months at the halfway house to learn "how to live my life in a better way." Then, according to Father, a relative had agreed to provide him with a job and a two-bedroom trailer home. And assuming he did not violate his parole, he would complete his current sentence in 2019.

Following the trial, the juvenile court entered an order terminating Father's parental rights to Jonathan. The court found clear and convincing evidence of the three statutory grounds for termination alleged in the petition. The court also found clear and convincing evidence that termination of Father's parental rights was in the child's best interest. This appeal followed.

**II.**

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g) (2017).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*,

833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A. GROUNDS FOR TERMINATING PARENTAL RIGHTS

1. Abandonment

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). The General Assembly has provided "five alternative definitions for abandonment as a ground for the termination of parental rights." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 36-1-102(1)(A) (2017) (defining the term "abandonment").

The fourth definition of "abandonment" applies in cases in which the parent is incarcerated or had been incarcerated within the four-month period preceding the filing of the petition to terminate and "contains two distinct tests for abandonment." *In re Audrey S.*, 182 S.W.3d at 865. One test examines pre-incarceration visitation and support, and the other examines the pre-incarceration conduct of the parent. The incarcerated or formerly incarcerated parent is deemed to have abandoned a child if he or she:

> either has willfully failed to visit . . . the child for four (4) consecutive months immediately preceding such parent's . . . incarceration, or the parent . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv). The juvenile court found that DCS had proven by clear and convincing evidence that Father had abandoned his child under both tests.

a. Willful Failure to Visit By Incarcerated Parent

While it is undisputed that Father was incarcerated when the petition to terminate was filed and did not visit his child during the relevant four-month period, Father

contends that his failure to visit was not willful. The question of willfulness "is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013). "Failure to visit . . . a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d at 864. A parent whose attempts to visit are "thwarted by the acts of others and circumstances beyond his control[] did not willfully abandon his child." *In re Adoption of A.M.H.*, 215 S.W.3d at 810.

Father argues that he was unable to visit because there were outstanding warrants for his arrest in Knox County. We have "previously . . . rejected the argument that self-created legal problems can excuse a parent's failure to visit his or her child." *In re M.C.G.*, No. 01A01-9809-JV-00461, 1999 WL 332729, at *8 (Tenn. Ct. App. May 26, 1999); *see also In re Angelica S.*, No. E2011-00517-COA-R3-PT, 2011 WL 4553233, at *6 (Tenn. Ct. App. Oct. 4, 2011) (rejecting the father's argument that his fear of deportation was a justifiable reason for his failure to visit); *In Matter of Shipley*, No. 03A01-9611-JV-00369, 1997 WL 596281, at *4 (Tenn. Ct. App. Sept. 29, 1997) (rejecting the father's argument that his failure to visit was not willful because he "'was on the run' from law enforcement").

Father also contends that his ability to visit was somehow impeded by DCS's failure to contact him. Reasonable efforts to reunite a family are relevant to the best interest analysis, not the grounds for termination. *In re Kaliyah S.*, 455 S.W.3d at 555. And DCS did not thwart Father's efforts to visit his son. To the extent Father argues that DCS did not explain the potential consequences of his failure to visit, our supreme court has rejected that argument. *See In re M.L.P.*, 281 S.W.3d 387, 392 (Tenn. 2009). All "parents should know that they have a responsibility to visit their children." *Id.*

We conclude that clear and convincing evidence supports the juvenile court's finding that Father willfully failed to visit his son during the four months preceding his incarceration. He knew the whereabouts of his son. And he made no attempt to visit even when he had the ability to do so. His excuses do not justify his failure to visit.

b. Wanton Disregard for the Welfare of a Child

As to the second test, Father argues that failure to report does not constitute wanton disregard for his child's welfare. But our review is not limited to the parent's behavior during the four months preceding the incarceration. *In re Audrey S.*, 182 S.W.3d at 871. Rather, "the parent's incarceration [is] a triggering mechanism that allows the court to take a closer look . . . to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child. *Id.* at 866.

"Wanton disregard" is not a defined term. "[A]ctions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68.

Clear and convincing evidence supports the trial court's finding that Father's pre-incarceration conduct exhibited wanton disregard for his child's welfare. Father has a long history of criminal activity. He has been in and out of jail so many times that he cannot recall the dates or the reasons for his various incarcerations. He has repeatedly resorted to selling drugs to pay his expenses, apparently indifferent to the consequences. And he took Jonathan with him to a hotel room with women engaged in prostitution.

2. Failure to Manifest an Ability and Willingness to Personally Assume Custody

The court also found termination of parental rights appropriate under § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he or she

> [1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14).

As to the first prong, DCS must prove by clear and convincing evidence that Father failed to manifest an ability and willingness to personally assume legal and physical custody of the child **or** that he failed to manifest an ability and willingness to personally assume financial responsibility for the child. *See In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018). Ability focuses on the parent's lifestyle and circumstances. *See In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018); *In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *7 (Tenn. Ct. App. Dec. 27, 2017). When evaluating willingness, we look for more than mere words. *See In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018) ("Although Mother testified that she was both willing and able, her actions proved otherwise."); *In re Amynn K.*, 2018 WL 3058280, at *15 ("We recognize that Father has repeatedly verbalized his willingness to assume custody of the Child.

However, Father's actions, including his continued criminal activity and his failure to financially support the Child, raise doubt as to Father's actual willingness to assume custody or financial responsibility for the Child."). Parents must have demonstrated their willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child. *See In re Isaiah B.*, No. E2017-01699-COA-R3-PT, 2018 WL 2113978, at *18 (Tenn. Ct. App. May 8, 2018) (focusing on the mother's lack of effort to remove the threat of domestic violence); *In re Maya R.*, 2018 WL 1629930, at *7 (focusing on the mother's lack of effort to fulfill her responsibilities in the parenting plan); *In re M.E.N.J.*, 2017 WL 6603658, at *7 (noting the mother's refusal to work with her case manager to obtain affordable housing).

With respect to the second prong, DCS must establish that placing the child in Father's custody would pose a risk of substantial harm to the physical or psychological welfare of the child by the same quantum of proof. *See In re Maya R.*, 2018 WL 1629930, at *7. Previously, we have described "a risk of substantial harm" in these terms:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

We conclude that Father failed to show an ability and willingness to personally assume legal and physical custody or financial responsibility for his child. At the time of trial, Father was incarcerated, unemployed, and homeless, with only a possibility of a better future. He clearly lacked the ability to assume custody of his child or to be financially responsible for him. And his glaring lack of effort to maintain a relationship with his son negates his professed willingness to parent. For five years, he made no attempt to visit or provide support for his son. Even when he learned that Jonathan had been physically abused, he took no action. His actions belie his words.

We further conclude that placing the child in Father's custody would pose a risk of substantial harm to the child's physical or psychological welfare. Father has demonstrated an appalling lack of concern for his child's welfare. Given the physical and emotional trauma Jonathan has already experienced, placing him in the custody of a father he barely knows or remembers poses a risk of substantial harm to his psychological

welfare.  And Father's criminal history creates a substantial risk that the child would be exposed to illegal activities.

## B.  BEST INTEREST OF THE CHILD

Next we must determine whether termination of Father's parental rights is in the child's best interest.  Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005).  Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts may consider in making a best interest analysis.  The best interest "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017).  In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682.

The focus of this analysis is on what is best for the child, not what is best for the parent.  *In re Marr*, 194 S.W.3d at 499.  Additionally, the analysis should take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).  Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn.), *cert. denied sub nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, 137 S. Ct. 44 (2016).

After considering the evidence in light of the statutory factors, the juvenile court found all relevant statutory factors favored termination of Father's parental rights.  *See* Tenn. Code Ann. § 36-1-113(i).  The evidence does not preponderate against the juvenile court's factual findings.

The first statutory factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home."  Tenn. Code Ann. § 36-1-113(i)(1).  While Father maintained he had changed, he admitted that he needed time after his release to learn "how to live my life in a better way."  As the juvenile court noted "[a]ny determination as to whether he has really made an adjustment of circumstance, whether he has really 'gotten his life together,' must wait until he is out and has a chance to demonstrate that."

Similarly, the second factor considers the potential for lasting change by asking "whether the parent . . . has failed to effect a lasting adjustment after reasonable efforts

9

by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." *See id.* § 36-1-113(i)(2). Again, whether Father can make a lasting adjustment of circumstance or conduct remains to be seen.

Father complains that DCS failed to make any effort to reunite him with his son. But the evidence does not preponderate against the juvenile court's finding that DCS's efforts were reasonable under the circumstances. DCS became involved with Jonathan in 2015. The DCS case manager was unable to obtain Father's contact information in Arkansas from Mother or maternal grandmother. DCS only discovered Father's whereabouts when he returned to prison after his probation was revoked. While Father points out that DCS contacted him previously in connection with two other cases, those contacts were in 2009 and 2010, well before his move to Arkansas.

The parent's efforts to visit or contact the child are considered under the third factor. *See id.* § 36-1-113(i)(3). Father has made no attempt to visit his child since April 2013. And Father could recall only one phone conversation with his son during that time. Father assumed maternal grandmother, Mother, and the grandparents of Jonathan's half-sibling were taking proper care of his son. And he claims that if he had known otherwise, he would have taken some action. But Father's lack of knowledge does not excuse his failure to contact or visit his son for five years.

Father's lack of contact adversely impacted his relationship with his son. *See id.* § 36-1-113(i)(4) ("Whether a meaningful relationship has otherwise been established between the parent . . . and the child."). On appeal, Father relies on his relationship with his son before he moved. But the evidence does not preponderate against the juvenile court's finding that "any relationship that may once have existed between [Father] and the child has been extinguished by his absence." The foster mom testified that Jonathan never mentioned or asked about Father.

The fifth factor evaluates the effect a change in caregivers would have on the child's emotional and psychological condition. *See id.* § 36-1-113(i)(5). At the time of trial, after years of instability, Jonathan was thriving in his foster home of two years. He was receiving the medication and counseling he needed. And he had developed a strong attachment to his foster mother, whom he called mom. As discussed above, he has no relationship with Father, and Father has yet to demonstrate the ability to care for his son. Changing this child's caregiver yet again would only re-introduce instability into his life, which would clearly have an adverse effect on his emotional and psychological condition.

Under the sixth factor, the court determines whether the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child" or another person in the household. *See id.* § 36-1-113(i)(6). After his move to

Arkansas, Father exhibited no concern for Jonathan's welfare. He never sent money for his support or attempted to verify that he was properly cared for.

The seventh factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [the intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner."). Father cannot provide a safe home for Jonathan while he is in prison or a halfway house. And although Father denied that he was a drug user, he has long been involved in selling drugs.

The final factor looks at the parent's child support history. *See id.* § 36-1-113(i)(9). Father never formally paid child support and never sent any money or gifts after he moved to Arkansas.

Considering the record as a whole, we conclude that the combined weight of the proof amounts to clear and convincing evidence that termination of Father's paternal rights was in the child's best interest. For most of Jonathan's life, Father has been content to allow others to care for him. For five years, Father has not written, visited, or sent money or gifts. And he only called once. Father is already a stranger to his son. During Father's absence, Jonathan moved from caregiver to caregiver and was both neglected and severely abused. For two years, Jonathan has enjoyed a stable, loving home environment with a foster parent who wants to adopt him. It is unclear when, if ever, Father will be in a position to provide a safe and appropriate home for his son.

### III.

The record contains clear and convincing evidence to support terminating Father's parental rights on all grounds relied upon by the juvenile court: abandonment by failure to visit by an incarcerated parent, abandonment by wanton disregard for the welfare of a child by an incarcerated parent, and failure to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. The record also contains clear and convincing evidence that termination is in the child's best interest. Thus, we affirm the judgment terminating Father's parental rights.

_____
W. NEAL MCBRAYER, JUDGE

11